Phyllis KAHN and Steven G. Thorne, Plaintiffs–Appellants,

v.

KOHLBERG, KRAVIS, ROBERTS & CO., a New York Limited Partnership, KKR Associates, a New York Limited Partnership, and Whitehall Associates, L.P., a Delaware Limited Partnership, Defendants–Appellees.

No. 1373, Docket 92–7028.

United States Court of Appeals, Second Circuit.

Argued May 22, 1992.

Decided June 30, 1992.

Sidney B. Silverman, New York City (Silverman, Harnes, Obstfeld & Harnes, of counsel), for plaintiffs-appellants.

F.J. Zepp, New York City (Latham & Watkins, of counsel), for defendants-appellees.

Before: PRATT and ALTIMARI, Circuit Judges, and KELLEHER, District Judge.*

KELLEHER, Senior District Judge:

Plaintiffs Phyllis Kahn and Steven G. Thorne appeal from the dismissal by the United States District Court for the Southern District of New York, John S. Martin,

Jr., *Judge*, of their complaint pursuant to Federal Rules of Civil Procedure (Fed. R.Civ.P.) 12(b)(6) on the ground that the action was barred by the statute of limitations. We affirm.

## I.  BACKGROUND

Plaintiffs commenced this direct and derivative action on August 21, 1991, seeking rescission of an investment advisory agreement entered into on September 25, 1987, by the Minnesota State Board of Investment (the "State Board"), as trustee for certain state employee pension funds (the "Retirement Funds"), and the defendant Kohlberg, Kravis, Roberts & Co. ("KKR"), on the grounds that the agreement violates the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq.* (the "IAA"), in several ways.

The 1987 Agreement provided that the Board was irrevocably committed to investing $146.6 million with KKR for investments that KKR chose and to paying KKR for its investment advisory services.  At KKR's direction, the Board would invest as a limited partner in certain limited partnerships established by KKR in order to acquire target businesses.  Defendant KKR Associates, which is controlled by KKR, would act as the general partner.  Defendant Whitehall, Associates, L.P., was the limited partnership created to facilitate the takeover of RJR Nabisco in 1988/89.

The Complaint alleges that the agreement violates the IAA in that KKR has failed to register as an investment adviser, 15 U.S.C. § 80b–3, that pursuant to it, in relation to the RJR transaction, KKR is to receive performance-based compensation which is prohibited, 15 U.S.C. § 80b–5, and that it fails to disclose the nature of the compensation to be received by KKR, 15 U.S.C. § 80b–6.

Plaintiffs sought a declaration that the 1987 Agreement, the "Whitehall Agreements," and the "KKR–Whitehall Agreements" are void as well as a restitution of

---

* Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

all fees paid to KKR pursuant to the agreements. These additional agreements are the partnership agreements used to facilitate the takeover.

KKR, KKR Associates, and Whitehall moved to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(7) on the grounds that (a) plaintiffs lacked standing to assert their claims, (b) plaintiffs had failed to join an indispensable party, (c) plaintiffs' claims were barred by the statute of limitations, and (d) plaintiffs were guilty of laches. The district court granted defendants' motion on the ground that the claims were barred by the statute of limitations and found it unnecessary to reach the other issues.

The jurisdiction of this Court is based upon 28 U.S.C. § 1291.

## II. WHAT IS THE PROPER STATUTE OF LIMITATIONS APPLICABLE TO ACTIONS FOR RESCISSION UNDER THE IAA?

### A. Creation of Private Cause of Action under IAA

■ The Investment Advisers Act regulates the conduct of investment advisers and provides that it may be enforced by the Securities and Exchange Commission through an action for injunctive relief. Section 215 of the IAA provides that contracts whose formation or performance would violate the act are void. In *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Supreme Court held that this created an implied private cause of action for rescission of the void contract and restitution and that this was the sole private remedy available under the Advisers Act. *Id.* at 24, 100 S.Ct. at 247, 249.

Since the cause of action for rescission pursuant to the IAA is implied, the court must determine the appropriate limitations period. This determination is a matter of law and thus is decided by this court *de novo*.

### B. Law Regarding Statute of Limitations for Implied Federal Causes of Action

When Congress has failed to provide a statute of limitations for a federal cause of action, courts generally borrow the state statute of limitations most analogous to the case at hand. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 2778, 115 L.Ed.2d 321 (1991). Because this rule has been followed for so long, if Congress is silent it is ordinarily assumed that it intends for the court to engage in state borrowing. *Id.*

The Court has recognized "a closely circumscribed exception" when it finds that "a state limitations period would frustrate the policies embraced by the federal enactment." *Id.* (citations omitted). Federal borrowing is followed "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Id.* (citations omitted).

> State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies.

*Del Costello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983) (citation omitted).

The "delicate" determination of the appropriate limitations period is made by following a "hierarchical inquiry," most recently summarized in *Lampf*.

1. Step One—Should the Limitations Period be Uniform?

a. The first step is to determine whether the statute of limitations should be uniform:

> Where a federal cause of action tends in practice to "encompass numerous and diverse topics and subtopics," ... such that a single state limitations period may

not be consistently applied within a jurisdiction, we have concluded that the federal interests in predictability and judicial economy counsel the adoption of one source, or class of sources, for borrowing purposes.

*Lampf*, 111 S.Ct. at 2779 (citations omitted).

### b. Examples of Step One

Thus the Court has determined that a uniform statute of limitations should apply for all RICO cases since RICO claims could be analogized to an endless number of state actions on the basis of the great variety of possible predicate acts for RICO claims. *Agency Holding Corp. v. Malley–Duff Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 2763–64, 97 L.Ed.2d 121 (1987). The Court also noted that many of the concepts and elements of RICO claims, such as a "RICO enterprise" and a "pattern of racketeering activity" had no analogue at common law. *Id.* at 150, 107 S.Ct. at 2764.

Likewise the Court determined that claims under 42 U.S.C. § 1983 should have a uniform statute of limitations since "every § 1983 claim can be favorably analogized to more than one of the ancient common-law forms of action ... [or to] one arising under a statute," each of which could have a different statute of limitations. *Wilson v. Garcia*, 471 U.S. 261, 273–75, 105 S.Ct. 1938, 1945–47, 85 L.Ed.2d 254 (1985). Not only would this create uncertainty for all parties, but scarce resources would be dissipated on "unproductive and ever-increasing litigation." *Id.* at 275, 105 S.Ct. at 1946.[1]

### 2. Step Two—Should the Limitations Period be Derived from a Federal or State Source?

The second step, assuming that the court decides to apply a uniform period, is to determine whether this period should be derived from a state or federal source. *Lampf*, 111 S.Ct. at 2779. In making this

determination, "the court should accord particular weight to the geographic character of the claim." *Id.* If the federal action has links to more than one state it poses the "danger of forum shopping and at the very least ... guarante[es] ... complex and expensive litigation over what should be a straightforward matter." *Id.* (citations omitted). Additionally, borrowing from state sources poses the risk of "the application of [an] unduly short state statute of limitations that would thwart the legislative purpose of creating an effective remedy." *Agency Holding*, 483 U.S. at 154, 107 S.Ct. at 2766 (citations omitted).

### 3. Step Three—Does a Federal Source Provide a Closer Fit?

a. If the court finds that the interstate character of the action supports federal borrowing, the "presumption of state borrowing requires that [it] determine that an analogous federal source truly affords a 'closer fit' with the cause of action at issue than does any available state-law source." *Lampf*, 111 S.Ct. at 2779. The relevant considerations will include, but not be limited to, "commonality of purpose and similarity of elements," *id.*, which period will further the policies behind the federal law, practicalities of application, the interest in uniformity, and the interest in having clearly defined, easily applied rules.

### b. Examples of Steps Two and Three

Thus, in *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), the Court decided that enforcement suits brought by the EEOC under Title VII of the 1964 Civil Rights Act should not be subject to a state limitations period since those limitations might unduly hinder the policy behind the Act by placing too great an administrative burden on the agency. 432 U.S. at 367–72, 97 S.Ct. at 2455–57; *see also Del Costello*, 462 U.S. at 172, 103 S.Ct. at 2294.

Similarly in *Del Costello*, 462 U.S. at 165–66, 103 S.Ct. at 2291, the Court deter-

---

**1.** In *Wilson* the Court chose to apply a uniform state statute. 471 U.S. at 275–76, 105 S.Ct. at 1947.

mined that the state limitations period for vacation of an arbitration award in a commercial setting was too short to apply to an employee's hybrid breach of a collective bargaining agreement/duty of fair representation claim since the aggrieved employee needed more time to determine that he had a claim, retain counsel, investigate the issues not raised by the union, and frame his suit. *Id.*

In contrast, the Court noted that the brief limitations period for vacating an arbitration award was appropriate in the usual commercial arbitration since the parties will usually be represented by counsel or have some experience and sophistication. In addition, the action to vacate will usually involve issues that were already presented and contested in the arbitration proceedings. *Id.* at 166, 103 S.Ct. at 2291. The Court also pointed out the substantive difference between the two claims. *Id.* at 167, 103 S.Ct. at 2292.

The *Del Costello* Court also rejected the lengthy state limitations period for a breach of contract action since it would frustrate the federal policy of resolving labor disputes quickly. *Id.* at 168–9, 103 S.Ct. at 2293.

Finally, the *Del Costello* Court decided that the appropriate source for borrowing was a federal statute that was fashioned to accommodate the same competing national interests and to suit the same unique context of labor relations. *See id.* at 171–2, 103 S.Ct. at 2294.

In *Agency Holding,* the Supreme Court found that federal antitrust statutes provided a closer analogy to a RICO claim than any state law alternative. 483 U.S. at 155, 107 S.Ct. at 2766. It first determined that RICO claims have a multistate nature since they often involve an interstate transaction, and indeed must have some nexus to interstate or foreign commerce, and the

predicate acts could take place in several states. *Id.* The Court contrasted this to § 1983 claims that require no interstate nexus and tend to take place in one state. *Id.* at 155, 107 S.Ct. at 2766.

The Court next considered the similarities in purpose and structure between the two federal statutes [2], the Congressional intent to pattern the RICO statute after the antitrust statute, the uniqueness of the concepts involved in a RICO claim, the federal policies at stake and the multistate nature of the claims. *Id.* at 150–55, 107 S.Ct. at 2764–67.

4. Special Procedure if Statute Also has an Express Cause of Action with an Express Statute of Limitations

*Lampf* also provides a special procedure in the case of a cause of action that is implied from a statute that also includes an express cause of action with an express time limitation.

First, if the statute of origin has an express remedial provision that is analogous, then the limitation period applicable to that should be used. *Id.* The rationale for this is clear:

> We can imagine no clearer indication of how Congress would have balanced the policy considerations implicit in any limitations provision than the balance struck by the same Congress in limiting similar and related protections.

*Id.*

Thus, the *Lampf* Court determined that the one and three year limitations periods applicable to many of the express causes of action under the 1933 and 1934 Securities Acts were the appropriate source for a limitations period for the implied cause of action under § 10(b) of the 1934 Act. The Court refused to apply the five year statute of limitations applicable to the § 20A insid-

**2.** "Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees. Both statutes bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clay-

ton Act and RICO is the carrot of treble damages. Moreover, both statutes aim to compensate the same type of injury; each requires that a plaintiff show injury 'in his business or property by reason of' a violation." *Agency Holding,* 483 U.S. at 151, 107 S.Ct. at 2764 (citations omitted).

er trading cause of action which was created over 50 years later on the grounds that the provision focused upon a "specific problem" and was longer on account of the "unique difficulties in identifying evidence of such activities" and that the purpose of § 20A was "to provide greater deterrence, detection and punishment of violations of insider trading." *Id.* 111 S.Ct. at 2781 (citations omitted). The Court found that not only was there no indication that the drafters of § 20A intended to extend that enhanced protection to other provisions of the 1934 Act, but that the text expressed their intent to leave other laws unaffected. *Id.*[3]

5. Application to IAA Action for Rescission

a. Step One—Should the Limitations Period be Uniform?

Following the analysis set out above, the first step is to determine whether the limitations period should be uniform. This turns upon whether the "federal cause of action tends in practice to 'encompass numerous and diverse topics and subtopics,' such that a single state limitations period may not be consistently applied within a jurisdiction." *Lampf.*

The plaintiffs argue that a uniform statute of limitations is not required since no catalogue of claims encompassing numerous and diverse topics is possible under the IAA as the only available cause of action is one for rescission of the adviser's contract. Defendants argue that a claim for rescission pursuant to § 215 could be analogized to a number of different state causes of action. A § 215 claim may be premised upon a violation of any provision of the IAA. If a court focused upon the alleged violation underlying the claim, it could conclude that the claim should be analogized to a violation of state securities regulations or the state professional code, common law

breach of contract, fraud, or an action for rescission.

Plaintiffs' analysis focuses upon the single remedy available and ignores the fact that there are numerous and varied grounds for invoking it. Clearly the inquiry into the different bases for a claim should focus on the factual and legal theories supporting the claim. Given the numerous possible arguments that could be made for analogizing § 215 claims to different causes of action, and the resulting potential for uncertainty and an excess of useless litigation, this appears to be an ideal case for a uniform period.[4] Having determined that the limitations period should be uniform, the next step is to determine whether the court should turn to a federal or state source.

b. Step Two—Should the Limitations Period be Derived from a Federal or State Source?

The second step, assuming that the court decides to apply a uniform period, is to determine whether this period should be derived from a state or federal source. As stated above, the court should consider whether the claim has a multistate character and the federal interest in having uniform and clearly defined rules, whether state limitations periods might thwart the federal legislative purpose, similarity of elements, and practicalities of application.

The plaintiffs contend that there is no basis for departing from the general state borrowing rule. They contend that the rescission claim could never be multistate in nature since the only parties who could bring the claim are the parties to the contract. Unlike the RICO and duty of fair representation claims presented in prior cases, the rescission claim has a clear counterpart at common law, *i.e.*, the action for

---

**3.** While the court may be influenced by evidence of Congressional intent, there is no *need* to show that at the time that Congress provided the express federal limitations period it intended that it would apply to this cause of action. *Del Costello,* 462 U.S. at 169 n. 21, 103 S.Ct. at 2293 n. 21. Rather, a source should be chosen "because it is the most suitable source for borrowing."

*Id.*

**4.** In fact, notwithstanding plaintiffs' contention that a uniform period is improper, they are actually requesting that a uniform period be applied. They just want that period to be the state period for rescission of an unlawful contract.

rescission of an unlawful contract. They contend that the intent of the IAA was to impose an obligation upon investment advisers similar to the fiduciary duty already imposed by state law.

Defendants argue that the claim is multistate in nature. First, the claim must involve the means of interstate commerce for jurisdictional purposes. 15 U.S.C. § 80b-14. Second, the violations may occur in several states. Third, it may involve multistate plaintiffs and defendants. They contend that the § 215 claim is more like a RICO claim, found to be multistate in *Agency Holding*, than a § 1983 claim, found to be confined to a single state in *Wilson v. Garcia*.

Again, defendants' arguments are far more persuasive. The violations could occur in numerous states both with respect to a single plaintiff and with respect to multiple plaintiffs. It is certainly preferable to have one uniform period and to eliminate the uncertainty and excessive litigation that could ensue if the various state's limitations period could potentially apply.

#### c. Step Three—Does a Federal Source Provide a Closer Fit?

The elements of a § 215 claim are more similar to claims under the Securities Acts than claims for breach of the common law fiduciary duty. Contrary to plaintiffs' characterization, the intricate regulations in the Act are not simply restatements of the common law fiduciary duty concept. They are detailed and complex provisions that demand the same kind of attention as those found in the 1933 and 1934 Securities Acts.

Most importantly, the limitations period provided for in the securities area represents a balancing of the same interests as are involved in the IAA. Both regulate the honesty and integrity of those who deal commercially on the national securities markets. In fact, plaintiffs commence their Complaint by stating that the securities statutes and the IAA were designed as part of a single body of National Securities Laws for the purpose of protecting investors and the securities markets from abuses.

The federal securities statutes clearly provide a "closer fit" than any available state period.

#### d. Did the Court Below Choose the Wrong Federal Law Source?

Plaintiffs' final contention is that even if federal borrowing is to be preferred in this case, that the court below borrowed from the wrong source.

The district court held that the most analogous federal limitations period was either the one year period found in § 36(b) of the Investment Company Act, 15 U.S.C. § 80a-1, *et seq.* (the "Company Act"), or the one year from discovery/three years from the violation period applied under both the 1933 and 1934 Securities Acts for sale of unregistered securities, §§ 77*l* and 77m, fraud in connection with a registration statement § 78r, fraud in connection with the offering or selling of securities, § 78i(e), § 78cc(b), and Rule 10b-5.

##### 1) Section 36(b) of the Company Act

The plaintiffs contend that § 36(b) of the Company Act is not analogous since it is a "unique" provision whose limitation period is directly related to its "extraordinary character."

The Company Act was enacted at the same time as the IAA and regulates the conduct of investment companies. Both acts impose similar requirements on investment advisers and investment companies and proscribe similar conduct. Section 215 of the IAA was part of the original enactment in 1940, while § 36(b) of the Company Act was added in 1970.

Section 36(a) regulates the relationship between an investment company and a person who serves as an officer, director, adviser, or underwriter to that company. Section 36(b) regulates the relationship between an investment company and any person acting as an investment adviser to that company. An action pursuant to § 36(a) must be brought within five years of the violation. There is no express time limit on bringing an action under § 36(b), but the

plaintiff may collect only those damages that have accrued in the prior year. Section 36(b) may be enforced only by the SEC and security holders of the company.

Plaintiffs contend that Congress could not have intended to apply the one year period of the 1970 amendment when it enacted § 215 in 1940. Yet, as pointed out in *Del Costello*, the court need not determine that Congress had the specific intent to apply the borrowed period.[5]

Plaintiffs also contend that § 36(b) is not analogous to § 215 since § 36(b) "create[d] an entirely new right" and that unlike the § 215 right, it may not be enforced by the investment company "client." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 535–541, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984).

They contend that the limitations period was made so short as part of a tradeoff with the securities industry for the new stricter standards it imposed. The statute imposes stricter standards upon the acceptable amount of compensation an investment adviser may collect. The limitation period is directly tied to this aspect of the legislation since rather than barring the assertion of a claim, it limits the period during which damages can accrue to one year prior to the filing of the action. *See* § 36(b)(3). Furthermore, the one year period is fully adequate for the Company Act § 36(b) claim since other provisions of the statute require that the shareholders review and approve the subject contracts annually. *See* 15 U.S.C. § 80a–15(c).

Plaintiffs contend that § 36(a) of the Company Act provides a more appropriate source since it was enacted at the same time as § 215 and at the time it was the only other federal statute to regulate a comparable fiduciary relationship at that time.

Defendants contend that § 36(b) is more analogous to § 215 since it regulates the relationship between an adviser and client. Further, the one year period represents the appropriate balance of interests by protecting investors and minimizing the disruption to the investment advisory industry.

Moreover, the short period is more appropriate in this case since defendants cannot conceal their violations as they are all premised on the failure to register. *See* 15 U.S.C. § 77m.

Again, defendants' arguments are more persuasive. There seems to be no basis for applying the excessively long five year period of § 36(a). Moreover, § 36(b) focuses on the analogous relationship, involves the same policy concerns, and provides for a similar restitutionary remedy.

### 2) The 1933 and 1934 Securities Acts

The one/three year period applicable to various provisions of the 1933 and 1934 Acts provides that suit must be commenced within one year of the discovery of the claim and at least three years after the date of the injury.

Plaintiffs contend that this one/three year period is not appropriate since those provisions are entirely different from the § 215 claim. Unlike § 215, the Securities Act sections apply to the sale of securities, involve claims of misrepresentation or fraud in relation to those sales, and require that there be some actual fraudulent intent. They characterize § 215 as focusing upon the investment adviser's fiduciary duty and imposing a far stricter standard.

Finally they argue that § 29 of the 1934 Act demonstrates Congress's intention that the one/three year period apply only to causes of action for fraud. 15 U.S.C. § 78cc(b). When originally enacted § 29 contained no limitations period. It was subsequently amended to provide that a one/three year period would apply but only to claims based upon § 15, which is an antifraud provision. Since § 29 can also encompass non-fraud claims, the inference is that the one/three year period should not apply to those claims. Defendants contend

---

**5.** The plaintiffs cite *Lampf* for the proposition that the court must demonstrate some basis that Congress, when it passed the later legislation, intended for its limitation period to apply to the pre-existing legislation. As explained *supra* that is not the law. Furthermore, it seems that the *Lampf* Court addressed the issue primarily because there was express language in the later legislation disclaiming any intent to effect other laws. *See* 111 S.Ct. at 2780.

that the IAA claims are also similar to the 1933 and 1934 Act claims. The purposes behind the statutes are almost identical. In fact, the Supreme Court has said that "Congress intended the [IAA] to be construed like other securities legislation 'enacted for the purpose of avoiding frauds.'" *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284–85, 11 L.Ed.2d 237 (1963) (citations omitted). Both sets of regulations operate in the same securities market context, proscribe similar conduct, and impose registration and disclosure requirements.

Specifically, the plaintiffs contend that the § 203 claim is identical to the 15 U.S.C. § 77l and 77m, failure to register claims, that § 206 claim duplicates the Rule 10b–5 fraud claim, and that the § 215 rescission remedy is parallel to the § 29(b) rescission remedy.

Again, defendants are correct. The one/three year period used in the Securities Acts is the most appropriate since it reflects the accepted balancing of the same interests and is consistently applied to claims posing the similar factual and legal issues.

Therefore, this Court finds that the appropriate limitations period to apply to an IAA action for rescission is either one year from the wrong or one year from the discovery/three years from the wrong.

## III. WHEN DID STATUTE OF LIMITATIONS BEGIN TO RUN IN THIS CASE?

A. In Applying Statute of Limitations Should Court Utilize Continuing Wrong Theory?

Plaintiffs argue that in applying the statute of limitations the lower court should have utilized the continuing wrong theory and found that the defendants' conduct was a continuing wrong. As such, the statute of limitations had not begun to run.

The district court refused to apply the continuing wrong theory holding that it "has been consistently rejected." The plaintiffs argue that the continuing wrong theory has been consistently applied in federal actions excluding one exception which does not apply here.[6]

■ Federal courts do recognize a continuing wrong theory, yet it does not apply in this case. The doctrine applies when the defendant's conduct causes plaintiff to sustain damages after the time when the statute of limitations would have expired if it commenced at the time of defendant's first act. Instead, the claim accrues each time the plaintiff sustains damages. The rule is based primarily upon the impracticality and unfairness of requiring a plaintiff to institute his action before he can predict his damages. *See Taylor v. Meirick*, 712 F.2d 1112, 1119 (7th Cir.1983).

For example, in the antitrust context, the courts hold that "'each time that a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act.'" *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (*quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971)). The *Berkey* court explained that the statute begins to run at the time that the plaintiff sustains injury and not when the defendant acts, since anti-competitive conduct by the defendant may give rise to damages in the future which are not predictable at the time of the initial act or within the limitations period. *Id.* at 295–96 (*citing Zenith Radio*, 401 U.S. at 339–40, 91 S.Ct. at 806–07).

In civil rights cases based upon a denial of seniority rights, the courts have held that "the denial of seniority rights was a continuing discrimination." *Allen v. Amalgamated Transit Union*, 554 F.2d 876, 880 (8th Cir.1977) (collecting cases). It

6. The plaintiffs cite to cases wherein the continuing wrong theory was applied to federal actions for antitrust, patent infringement, and violation of civil rights. They claim that the cases relied upon the district court involve the exception for completed sales transactions. They claim that since this action is based upon an on-going service contract, which is executory, the completed sales doctrine does not apply.

is clear that this is based upon the fact that the plaintiff is continuing to receive disparate treatment, in violation of the civil rights statute, as long as he remains employed and is not given seniority rights. *See id.* at 880–881 n. 5.

Similarly, in a civil rights class action based upon installment contracts offered on different terms on the basis of race, one court said that, as in the antitrust context, "the relationship [between the sellers and purchasers] constituted a prolonged and continuing invasion of the rights of the purchasers." *Baker v. F & F Invest.*, 420 F.2d 1191, 1200 (7th Cir.1970), *cert. denied*, 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970). The court said that the limitations period did not begin to run at the execution of each contract since the defendants repeated the overt acts of entering into discriminatory contracts and reaping the unlawful benefits. *Id.* The court focused on the fact that plaintiffs had alleged a conspiracy to establish an ongoing discriminatory relationship with the entire class of plaintiffs and analogized the situation to the antitrust cases.

In the copyright infringement context, another court found that the infringement was a continuing wrong as long as the defendant and his co-tortfeasors continued to sell the infringing copies. *Taylor*, 712 F.2d at 1119. Thus, plaintiff had to bring the suit within the statutory period from the last infringing sale, but he could reach back to sales before the statutory period in order to collect his damages. *Id.*[7]

■ Defendants contend that the completed sales transaction theory or commitment theory applies here. That theory provides that the wrong occurs when the plaintiff makes a completed sales transaction. *See, e.g., Department of Economic Dev. v. Arthur Andersen & Co.*, 683 F.Supp. 1463, 1475 (S.D.N.Y.1988); *Ingenito v. Bermec*

*Corporation*, 376 F.Supp. 1154, 1184 (S.D.N.Y.1974). In other words, once plaintiff has committed itself to the transaction, the claim accrues and thus the statute begins to run. When the plaintiff actually fulfills his obligations under the contract, a new wrong is not created since he was already bound to do so. *Id.* Thus, subsequent payments on a completed sales transactions affect the amount of damages but do not constitute separate wrongs.

■ The test for whether the commitment theory applies to a contract calling for subsequent payments is whether the plaintiff was committed to pay that amount under the contract or whether he retained the right to terminate the contract and not pay that amount. *Arthur Andersen*, 683 F.Supp. at 1475; *Ingenito*, 376 F.Supp. at 1184.

■ For example, in *Ingenito*, 376 F.Supp. at 1184, the court found that payments on a promissory note given as consideration for a completed sale did not give rise to new claims while payments pursuant to a maintenance contract did, since by its terms plaintiff was not obligated to continue the maintenance contract and retained the right to cancel it at any time. *Id.*

Defendants contend that here the 1987 Agreement created a binding obligation upon the Board to commit a certain amount of capital to investments chosen by KKR. The subsequent payment of fees or rendering of advice by KKR could not give rise to a new cause of action. Since the plaintiffs allege that the contract violated the IAA at the moment it was entered into, the claim accrued at that time.

Plaintiffs argue that the 1987 Agreement was not binding since it could be cancelled by rescission. It is settled though that the commitment theory tests whether a con-

---

**7.** There appears to be some conflict about whether the continuing wrong theory allows a plaintiff to reach back past the limitations period to point to wrongful conduct, but not to calculate damages, or whether it permits the plaintiff to reach back in order to calculate his damages as well. *Compare Taylor*, 712 F.2d at 1119 ("letting him reach back and get damages for the entire duration of the alleged violation") *with Berkey Photo*, 603 F.2d at 295 ("The plaintiff, therefore, clearly can recover only for overcharges suffered since the beginning of the limitations period. It remains to be decided, however, whether the conduct element of the offense may be satisfied by wrongful action occurring before the limitations period.").

tract is binding or terminable *by its terms.* *Freschi v. Grand Coal Venture,* 551 F.Supp. 1220, 1229–30 (S.D.N.Y.1982). The possibility of rescinding the contract on the grounds that it violated the IAA does not make the subsequent payments new wrongs.

Plaintiffs assert a number of theories for why the continuing wrong theory should apply in this case. They are all basically the same theory, rephrased, and all are meritless.

Plaintiffs argue that the continuing wrong theory applies since the agreement calls for defendants to render on-going investment advice. They contend that this continuing "special relationship" constitutes a continuing wrong relying upon *Baker,* discussed above, and *Eli Lilly and Co. v. EPA,* 615 F.Supp. 811 (S.D.Ind.1985).

The *Baker* principle does not apply in this case since the defendants entered into one discrete contract with plaintiffs after which plaintiffs were committed to invest a set amount of money. The *Eli Lilly* reasoning is also not applicable since that case focused on the ongoing statutory authority of the EPA over pesticide registrants under the Federal Insecticide, Fungicide, and Rodenticide Act. *Eli Lilly,* 615 F.Supp. at 822–23. The relationship between two private parties pursuant to a contract cannot be equated with that kind of relationship, even if it is regulated by statute.

Similarly, plaintiffs contend that the continuing wrong theory applies since the violation of the IAA is ongoing. They assert that a violation of § 203 occurs whenever an unregistered person functions as an investment adviser. Thus, each time KKR acted as an investment adviser, that constituted a new violation. They contend that the fact that KKR was already committed to do those acts does not alter the fact that those acts are independent violations of the statute.

This argument ignores the clear holding of the courts that performance under the contract merely affects damages and does not give rise to a new cause of action.

Plaintiffs contend that the continuing duty of KKR to register extends the limitations period. Yet, the cases they rely upon do not support this argument. One case actually applies the commitment theory to a fiduciary's duty to withdraw from an imprudent investment that it is not obligated to continue. *Buccino v. Continental Assur. Co.,* 578 F.Supp. 1518, 1521 (S.D.N.Y.1983). Another case holds that the offense of a draftee's failure to advise the draft board of his current address was not committed and completed on the first day of such failure but rather was a continuing offense as long as the draftee failed to update the board. *United States v. Guertler,* 147 F.2d 796, 797 (2d Cir.1945).

The investment adviser also owes a duty to the government to register. Yet, he harms the purchaser of his investment advice at the time that he enters into a contract that commits the purchaser to pay for the advice. Moreover, the different context of *Guertler* and the fact that the commitment theory has been consistently applied in the securities law context (*see Arthur Andersen, Ingenito, Freschi*) suggest that it is far more appropriate to apply the commitment theory here.

Similarly, plaintiffs argue that the agreement is executory and that the statute of limitations on an executory contract does not begin to run until the contract becomes non-executory. Plaintiffs are not correct. The contract was not executory as KKR was bound to perform under the terms of the contract, the Board was bound to perform once KKR had performed, and the Board could have sued KKR for breach if it failed to perform.

Plaintiffs' final plea is that since the payments due under the contract are illegal, to the extent that they are not yet due, the Court will be sanctioning the payment of illegal fees if the action is barred. They claim that at least they should be able to rescind the remainder of the agreement or obtain a declaration that the contract is illegal so that the Board can withhold further performance.

This argument ignores the whole purpose behind a statute of limitations and the

importance of the policy of repose. The function of a statute of limitations is to set a time after which conduct will not be subject to challenge, on any grounds. After the statutory period has passed, the plaintiffs may not bring the action regardless of the relief requested.

■ Therefore, on the claim for rescission of the 1987 Agreement, the court properly found that the wrong occurred in 1987. Applying the more liberal one/three year statute of limitations to that date, the district court did not err in finding that the statute has expired since over three years had passed before this action was filed on August 20, 1991.

B. Should the Court Determine that Contract at Issue for the Purpose of Commencing the Statute of Limitations was the 1987 Contract or the 1988/89 Partnership Agreements?

■ Plaintiffs argue that the lower court incorrectly determined that the date of the contract at issue was 1987. They contend that it ignored the four allegedly illegal contracts entered into in 1989. They argue this finding of fact should be overturned since it was clearly erroneous.

The only contract clearly identified in the Complaint as an investment advisory contract entered into on a specified date and alleged in violation of the IAA was the 1987 Agreement. While the Complaint references the partnership agreements, it does not allege the dates on which they were entered or how they violated the IAA. Thus, on this 12(b)(6) motion it was entirely proper for the district court to consider the 1987 Agreement as the sole basis for the accrual of the claim.

Besides, even if accrual is based upon the 1988–89 limited partnership agreements, the statute has still run. First, the cause of action would accrue when the agreements were entered into under the reasoning above.

Applying the most liberal statutory period applicable, the one year from discovery/three years from violation, found in the 1933 and 1934 Acts, the district court would be compelled to find that the period

has run as over one year had passed since plaintiffs' discovery of their injury.

■ Discovery takes place when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge. *Ingenito v. State Mutual Life Assurance Company of America*, 441 F.Supp. 525, 554 (D.C.N.Y.1977).

■ Both the Board and the plaintiffs knew or should have known the basis for the claims at least at the time that the 1988–89 agreements were executed. The violations of the IAA are all premised upon KKR's duty to register. The facts triggering that duty and allegedly disqualifying KKR from the exception were obviously known to the Board, as well as the investing public in general. The fact that KKR had not registered was a matter of public record. Additionally, the nature and structure of the fee arrangement was disclosed to the Board in the contract and also was widely publicized.

Plaintiffs' complaint admits that KKR was notorious for doing deals like the one with the Board and RJR. KKR publicized its services broadly, particularly at national meetings of state investment managers. The fact that it had over fifteen clients or investing partnerships (which would have triggered the duty to register and disqualified KKR for the exception) was thus clearly known to the Board and the investing public as well. KKR's intention not to register under the IAA was made public by a No–Action letter to the SEC reported in an official reporter in 1985 and by the fact that such public registration was absent from the public records.

Therefore, the district court did not err in finding that the facts giving rise to a claim to rescind the 1988/89 partnership agreements were known or should have been known at least to the Board, the party in interest, as of the time that the agreements were executed. Since one year had passed before the instant complaint was filed, any claim to rescinding those con-

tracts would also be barred by the statute of limitations.

We have considered plaintiffs' other contentions and find them meritless.

## CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.