666 A.2d 664

**Eugene J. O'SULLIVAN, Appellee,**

v.

**JOY TECHNOLOGIES, INC., A Delaware Corporation, Appellant.**

Superior Court of Pennsylvania.

Argued May 18, 1995.

Filed Oct. 6, 1995.

142

Richard R. Nelson, II, Pittsburgh, for appellant.

William Wycoff, Pittsburgh, for appellee.

Before POPOVICH, HUDOCK and OLSZEWSKI, JJ.

POPOVICH, Judge:

This is an appeal from the judgment entered in the Court of Common Pleas of Allegheny County. We are asked to determine whether under the law of New York, the lower court erred in enforcing a registration agreement between appellant, Joy Technologies Inc. ("Joy") and appellee, Eugene J. O'Sullivan ("O'Sullivan") and awarding damages with prejudgment interest to O'Sullivan. Upon review, we affirm.

The record reveals that Joy was a manufacturer of coal mining and environmental equipment. O'Sullivan was Chief Financial Officer of Joy and a holder of its stock. In 1987, the parties entered into the Amended and Restated Equity Registration Agreement ("Registration Agreement").[1] The Registration Agreement contained the following clause which is the focus of dispute herein:

2. *Piggyback Registrations.*

(a) *Right to Piggyback.* Whenever the Company proposes to register any of its equity securities under the Securities Act (other than pursuant to a Demand Registration) and the registration form to be used may be used for the registration of Registerable Securities (a "Piggyback Registration"), the Company shall give prompt written notice (in any event within 10 business days after its receipt of notice of any exercise of other demand registration rights) to all

1. Paragraph 9(i) of the Registration Agreement states that the law of New York shall govern all questions concerning its construction, validity and interpretation. RR. 729.

holders of Registerable Securities of its intention to effect such a registration and shall include in such registration all Registerable Securities with respect to which the Company has received written requests for inclusion therein within 15 days after the receipt of the Company's notice.

RR. 717. Paragraph 9(j) of the Registration Agreement governed the method of notice as follows:

(j) *Notices.* All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally or mailed by certified or registered mail, return receipt requested and postage prepaid, to the recipient....

RR. 729.

On October 11, 1991, Joy filed a Form S–2 Registration Statement with the Securities and Exchange Commission as a first step toward making an initial public offering. RR. 910–1055. On or about October 15, 1991, O'Sullivan read an article in *The Wall Street Journal* which summarized a press release by Joy. The article stated:

JOY TECHNOLOGIES Inc., Pittsburgh, said it registered with the Securities and Exchange Commission for an initial public offering of 8.5 million common shares at an expected offering price of $15 to $17 a share. Joy, which was taken private in 1987, makes coal mining, air pollution and ash handling equipment. It will use proceeds to redeem preferred stock. The company provided an overallotment option of 1,275,000 shares and will offer 6.8 million of the shares in North America and the rest overseas. Morgan Stanley & Co. is lead underwriter.

RR. 789.

On or about November 5, 1991, O'Sullivan received a letter from Joy concerning a Lock–Up and Waiver Agreement. That letter was dated November 4, 1991, and requested that each shareholder "restrict the sale of your shares of Common Stock for a period of 180 days after the date of the Initial Public Offering ... and ... waive any registration rights you

may have in connection with the Offering." RR. 785. O'Sulli-van did not sign the Lock–Up and Waiver Agreement. RR. 327.

On November 15, 1991, Joy registered its stock at $17.00 a share. At the time of registration, O'Sullivan held 50,000 shares which were worth $799,000, inclusive of underwriter commissions. RR. 349. On November 18, 1991, O'Sullivan faxed a letter to Jane Davis, General Counsel of Joy, that informed Joy that he intended to sell his shares in the market. Moreover, in that letter, O'Sullivan asked Joy whether the piggyback provisions of the Registration Agreement were applicable. RR. 791–792.

On January 21, 1992, O'Sullivan again sent a letter to Attorney Davis which provided in part:

> Regarding my "Piggyback Registration" rights, I reread the November 4, 1991 letter requesting that I sign a Lock–Up and Waiver Agreement, in light of the Notice requirement of Section 2(a) of the Amended and Restated Equity Registration Agreement. The November 4 letter was not intended to represent such a notice, was not timely, and did not accomplish the purpose of such a notice. Furthermore, under Section 2(a), holders have fifteen days from receipt of a notice in which to request a Piggyback Registration. The registration went effective November 15, only eleven days after the November 4 letter.
>
> Had I been properly notified, I would have requested that all my shares be included in the registration. Based on the oversubscription, it appears my request could have been accommodated. Rather, I am left with a significantly restricted ability to transfer my shares, exposing me to an unacceptable risk of loss.

RR. 794.

In the Spring of 1992, 16,000 of O'Sullivan's shares became unrestricted, and he lodged those unrestricted shares with his broker with the intention of selling them. On March 2, 1992, O'Sullivan sold 2,000 shares at a price of $15.62 per share. RR. 345–346. After the aforementioned sale, the price of

Joy's stock dropped rapidly and as of the time of trial in September, 1993, had never exceeded $15.50 per share and had reached a low of under $9.00 per share. On September 10, 1993, the last trading day before trial, Joy stock was selling at $10.875 per share. RR. 347.

Following a jury trial, a verdict was returned for O'Sullivan in the amount of $247,840.00. Thereafter, the verdict was molded to add prejudgment interest in the amount of $40.944.53. The lower court determined that November 15, 1991, marked the accrual date for prejudgment interest. This timely appeal ensued.

Joy raises the following issues for our evaluation:

I. THE TRIAL COURT ERRED IN FAILING TO DIRECT THE ENTRY OF JUDGMENT IN JOY'S FAVOR AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT BECAUSE MR. O'SULLIVAN ADMITTED HAVING TIMELY, ACTUAL KNOWLEDGE OF THE FACTS OF WHICH JOY WAS REQUIRED TO GIVE TO HIM NOTICE.

A. Joy Did Not Breach The Amended Registration Agreement Because Mr. O'Sullivan Had Actual Knowledge Of All Required Information.

B. Even If Joy Breached The Notice Requirement In Section 2(a) Of The Amended Registration Agreement, Any Such Breach Was Immaterial And Did Not Cause Mr. O'Sullivan Any Harm.

II. THE TRIAL COURT ERRED IN DENYING JOY'S MOTION FOR A NEW TRIAL BECAUSE THE JURY INSTRUCTION ON THE KEY ISSUE OF ACTUAL KNOWLEDGE WAS CLEARLY ERRONEOUS AND BECAUSE THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

III. THE TRIAL COURT ERRED IN DENYING JOY'S MOTION FOR A NEW TRIAL ON DAMAGES BECAUSE MR. O'SULLIVAN FAILED TO MITIGATE HIS DAMAGES AND BECAUSE THE JURY INSTRUCTION ON THE KEY ISSUE OF MR. O'SULLIVAN'S DUTY TO

MITIGATE HIS DAMAGES WAS CLEARLY ERRONE-
OUS.

    A.  Mr. O'Sullivan Had A Duty To Mitigate His Dam-
ages, Which He Failed To Do.

    B.  Joy Is Entitled To A New Trial On The Issue Of
Damages Because The Jury Instruction On The Key Issue
Of Mr. O'Sullivan's Duty To Mitigate His Damages Was
Clearly Erroneous.

    C.  Joy Also Is Entitled To A New Trial On The Issue Of
Damages Because The Jury's Award, Which Effectively
Excused Mr. O'Sullivan's Failure To Mitigate His Damages,
Was Against The Overwhelming Weight Of The Evidence.

IV.  THE TRIAL COURT ERRED WHEN IT DETER-
MINED THE ACCRUAL DATE OF ANY RIGHT TO
PREJUDGMENT INTEREST IN THIS CASE.

Appellant's Brief at i-ii.

    ■  In the first contention presented herein, Joy challenges
the lower court's denial of its motions for a directed verdict
and judgment notwithstanding the verdict. "Our standards of
review when considering motions for directed verdict and
judgment notwithstanding the verdict are identical. We may
reverse only if we find an abuse of discretion or an error of
law which controlled the outcome of the case." *Walker v.
Grand Central Sanitation, Inc.*, 430 Pa.Super. 236, 242, 634
A.2d 237, 240 (1993), citing *Timbrook v. Foremost Ins. Co.*, 324
Pa.Super. 384, 471 A.2d 891 (1984). "We must also consider
the evidence, together with all favorable inferences drawn
therefrom, in a light most favorable to [appellee], the verdict
winner." *Walker*, 430 Pa.Super. at 242, 634 A.2d at 240, citing
*Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003 (1992). "We
must ... afford the verdict winner the benefit of every
inference which may reasonably be drawn from the evidence,
while rejecting all unfavorable testimony and inferences."
*Smith v. Penbridge Assoc., Inc.*, 440 Pa.Super. 410, 415, 655
A.2d 1015, 1018 (1995) (citations omitted).

    ■  Guided by the aforementioned standard, we proceed
to address the merits of Joy's claim that it did not breach the

Registration Agreement because O'Sullivan had actual knowledge of its intention to register shares. Joy argues that upon reading the article in *The Wall Street Journal* on or about October 15, 1991, O'Sullivan was fully apprised that Joy intended to make a public offering of its shares. Written notice, as required by the provisions of the Registration Agreement, was not given to O'Sullivan. However, Joy maintains that the requirement of notice was superseded by O'Sullivan's actual knowledge. To buttress its argument, Joy cites N.Y.U.C.C. Law § 1–201(25)(a) (McKinney 1993), *Chase Manhattan Bank, N.A. v. Natarelli*, 93 Misc.2d 78, 401 N.Y.S.2d 404 (N.Y.Sup.Ct.1977), and *Minkoff v. Jaunty Junior, Inc.*, 36 N.Y.S.2d 507 (N.Y.Sup.Ct.1942).

Section 1–201(25)(a) of the U.C.C. provides that "[a] person has 'notice' of a fact when ... he has actual knowledge of it...." The Registration Agreement unequivocally provides that notice is effectuated only by writing. Section 1–201 does not require written notice. "While the general definition of notice found in Article 1 does not establish any formal requirements for notice, other articles of the Code may require a writing with respect to notice given within the scope of those articles." Anderson, U.C.C. § 1–201:128, p. 254 (3d ed. 1981). Because the parties specifically agreed that writing governed the method of notice, we are of the opinion that N.Y.U.C.C. Law § 1–201 is not dispositive of the facts in the case at bar. Similarly, we find that *Chase Manhattan Bank, supra,* and *Minkoff, supra,* are not applicable to the circumstances herein. In those cases, the court was not presented with a contract that expressly stated that notice must be in writing.[2]

We recognize that New York courts espouse the principle which holds the parties to the terms of their agreement. "[T]he rule is well settled that a court may not, under the guise of interpretation, make a new contract for the parties or

2. On pages 19–20 of its brief, Joy cites case law other than New York in support of its assertion that actual knowledge trumps the requirement of written notice. Upon examination, we are not convinced that those decisions are instructive to the question posed in this case. Unlike here, written notice was not contractually agreed upon and/or no damage resulted.

change the words of a written contract ... if to do so, would contradict the clearly expressed language of the contract." *Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 386, 239 N.E.2d 628, 630, 292 N.Y.S.2d 878, 881 (1968). "[A] court may not rewrite into contract conditions that parties did not insert or, under the guise of construction, remake a contract to implement an unexpressed intention." *Matter of 17th Glenville Corporation v. Town of Glenville*, 214 A.D.2d 792, 793, 625 N.Y.S.2d 100, 101 (Third Dept.1995). "If the parties to a contract adopt a provision which contravenes no principle of public policy and is not ambiguous, the courts have no right to relieve one of them from disadvantageous terms by a process of interpretation." *Seifert, Hirshorn & Packman, Inc. v. Insurance Co. of North America*, 36 A.D.2d 506, 507, 321 N.Y.S.2d 815, 816 (First Dept.1971).

If we were to find that O'Sullivan's reading of the article in *The Wall Street Journal* fulfilled Joy's obligation to provide notice under the Registration Agreement, we would essentially obviate the express language of paragraphs 2(a) and 9(j) of this contract. We decline to relieve Joy of its contractual duty. We hold that the nature of notice required by a contract hinges upon the provisions of the contract. 58 Am. Jur.2d, *Notice*, § 31. Compare *Chester Electrical Construction Corp. v. HBE Corp.*, 1995 WL 7974, 1995 U.S.Dist. LEXIS 116 (S.D.N.Y.1995) (actual notice not superseding the requirement of written notice as provided in contract). Consequently, we reject Joy's assertion that notice is dictated by events outside the specifications of the contract.[3]

---

**3.** We note the discrepancy as to whether O'Sullivan had actual knowledge of Joy's proposal to register shares. The lower court found that the article in *The Wall Street Journal* was suspect since it "stated that the shares had already been registered, and therefore cannot purport to be notice of Joy's *proposal* to register its shares." Trial Opinion 11/2/94 at 4. Further, the court below determined that notice from a source not in privity of contract was inadequate in light of our court's decision in *CBS, Inc. v. Capital Cities Communications, Inc.*, 301 Pa.Super. 557, 448 A.2d 48 (1982). Trial Opinion 11/2/94 at 3. At trial, O'Sullivan testified that upon reading the article, he was uncertain if his shares were registered by Joy. RR. 381. Had Joy complied with its contractual duty, there would be no dispute as to whether O'Sullivan had actual knowledge. *See Aqua Bar & Lounge, Inc. v. United States*, 438

■ Joy next argues that its breach of the notice requirement was immaterial and did not cause Mr. O'Sullivan any harm. Joy cites *Bivins v. Helsby*, 55 A.D.2d 230, 389 N.Y.S.2d 917 (Third Dept.1976). There, the court addressed a notice requirement promulgated by an administrative agency. We do not find that *Bivins, supra*, provides guidance on the issue of a material breach. We agree with the trial court's assessment that Joy's breach was material and caused compensable harm to O'Sullivan:

> Simply stated, [O'Sullivan's] damages are that he lost the opportunity to exercise his right to have his stock included in the registration, at that time and at that place. Since, he was not notified according to the terms of the agreement, his stock was unregistered, and he was not free from restrictions enabling him to participate in the public offering.

Trial Opinion 11/2/94 at 4. Hence, we hold that the lower court did not commit an error of law nor an abuse of discretion in denying Joy's motions for a directed verdict and judgment notwithstanding the verdict.

■ We now direct our attention to the second issue presented herein. Joy contends that the lower court erred in denying its motion for a new trial because the court improperly charged the jury on the issue of actual knowledge and the verdict was against the weight of evidence. "A motion for a new trial based upon the sufficiency of the jury charge will only be granted when the court determines that the charge in its entirety and against the background of the evidence was erroneous and might have prejudiced appellant." *Sedlitsky v. Pareso*, 425 Pa.Super. 327, 332, 625 A.2d 71, 74 (1993), quoting *Beechwood Commons Condominium Ass'n v. Beechwood*

F.Supp. 655, 657 (E.D.Pa.1977) ("The purpose of requiring a particular method of giving notice is to prevent disputes over whether notice was received").

Joy briefly asserts that its letter dated November 4, 1991, with enclosures to O'Sullivan provided sufficient notice of Joy's intention to register its stock. Appellant's Brief at 18. Upon review, we are convinced that this communication failed to comply with the notice requirements under the Registration Agreement.

*Commons Associates, Ltd.,* 397 Pa.Super. 217, 227, 580 A.2d 1, 6 (1990). "When reviewing whether a verdict is against the weight of the evidence, a new trial will be granted only where the jury's verdict was so contrary to the evidence as to shock one's sense of justice...." *Insurance Co. of State of Pa. v. Miller,* 426 Pa.Super. 519, 522–523, 627 A.2d 797, 798 (1993).

▮ Joy proposed the following jury instruction:

If you find that Mr. O'Sullivan had actual notice or knowledge of the proposed initial public offering in a timely manner, then you *must* find that Joy Technologies provided him with sufficient notice under the contract, and you *must* return a verdict in favor of Joy Technologies.

RR. 156 (emphasis added). The lower court gave the following charge:

If you find that Mr. O'Sullivan had actual notice or knowledge of the proposed Initial Public Offering in a timely manner, then you *may* find that Joy Technologies provided him with sufficient notice under the contract, and you *may* return a verdict in favor of Joy Technologies.

RR. 646 (emphasis added). Joy argues that the lower court erred in substituting the word "may" for "must". Joy takes the position that the court improperly allowed the jury to decide a question of law: "[W]hether Mr. O'Sullivan's actual knowledge of the facts was legally sufficient to supersede the requirement for written notice of those facts[?]" Appellant's Brief at 24.

Joy's challenge to the court's instruction to the jury is premised on the notion that actual knowledge overrides the written notice requirements of a contract. The propriety of that argument was disposed of in our discussion of Joy's first issue. We are of the opinion that when the trial court allowed the jury to determine whether actual notice or knowledge may excuse Joy from its contractual duty, Joy received an instruction which was more favorable than it was entitled to receive. Compare *Wilkerson v. Allied Van Lines, Inc.,* 360 Pa.Super. 523, 521 A.2d 25 (1987) (trial court charged jury on question of law that was to appellant's benefit). We find that actual

notice or knowledge would suffice only if it stemmed from and adhered to the notice provisions of the Registration Agreement.[4] Consequently, we conclude that the lower court did not commit an error of law in refusing Joy's proposed charge.

■ As to Joy's claim that the verdict was against the weight of evidence, the record reveals that Joy failed to provide written notice to O'Sullivan which caused substantial losses to him. We do not discern that the jury's verdict was so contrary to the evidence as to shock one's sense of justice. Therefore, the lower court correctly denied Joy's motion for a new trial pertaining to Joy's jury instruction on actual knowledge and its weight-of-evidence claim.

■ Joy's third issue contests the lower court's denial of its motion for a new trial on damages. Our standard of review of a trial court's denial of a motion for a new trial is "whether the trial court clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case." *Palange v. City of Philadelphia Law Dept.*, 433 Pa.Super. 373, 376, 640 A.2d 1305, 1307 (1994). *See Botek v. Mine Safety Appliance Corp.*, 531 Pa. 160, 164, 611 A.2d 1174, 1176 (1992) (whether to grant a new trial because of excessiveness or inadequacy of verdict is a matter within peculiar and sound discretion of trial court).

■ Joy maintains that O'Sullivan did not, as a matter of law, mitigate damages within a reasonable time, and that the lower court failed to instruct the jury as such. Specifically, Joy argues that O'Sullivan did not mitigate damages within a reasonable time because he used the market value on September 10, 1993, to calculate the damages for his remaining 48,000 shares.[5] The court below determined that the issue of wheth-

4. We note that O'Sullivan's proposed jury instruction correctly stated that the Registration Agreement compelled Joy to provide prompt written notice to O'Sullivan of its proposal to register shares and, "any form of notice other than written prompt notice from [Joy] to [O'Sullivan] is not sufficient notice to [O'Sullivan]." R. 18.

5. O'Sullivan informs our court that on October 4, 1993, he sold the 48,000 shares at a price below the closing price of September 10, 1993, used to calculate his damages.

er O'Sullivan action was reasonable should be decided by the jury. The court charged the jury as follows:

> Mr. O'Sullivan's duty was to act in a commercially reasonable manner; and you *may* find that under the circumstances it *may* not have been commercially reasonable for him to sell his shares. I want to clarify that and add that to plaintiff's duty to mitigate.[6]

RR. 661.

In *Van Syckle v. C.L. King & Assoc., Inc.*, 822 F.Supp. 98, 102 (N.D.N.Y.1993), the United States District Court of the Northern District of New York articulated the following analysis:

> Once it is determined that a plaintiff had a duty to mitigate damages, it must be ascertained whether the plaintiff's action taken in response to the defendant's conduct was reasonable. *See Novelty Textile Mills, Inc. v. C.T. Eastern, Inc.*, 743 F.Supp. 212, 219 (S.D.N.Y.1990) (citation omitted). If the course of conduct chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have further lessened plaintiff's damages. *Id.* (citation omitted).

*See Bache & Co., Inc. v. International Controls Corp.*, 339 F.Supp. 341, 351 (S.D.N.Y.1972) (whether the plaintiff acted within a commercially reasonable time "depends upon the nature of the goods, the condition of the market and the other circumstances of the case; its length cannot be measured by any legal yardstick or divided into degrees").

Here, the breach of contract occurred on November 15, 1991, when Joy registered its stock. The stock sold for $17.00

---

**6.** The trial court had previously given the jury the following instruction on plaintiff's duty to mitigate:

> Even if Mr. O'Sullivan could not entirely avoid any loss, he had an obligation to minimize or lessen his loss by selling his shares as soon as reasonably possible under the circumstances.
>
> If you do award damages your award should be limited to the difference between the price Mr. O'Sullivan could have obtained for his shares in the Initial Public Offering and the price he could have obtained for his shares within a reasonable time after the Initial Public Offering.

RR. 652.

per share. Because of Joy's breach, O'Sullivan could not sell any of his 50,000 shares until the spring of 1992, when 16,000 of those shares became unrestricted. On March 2, 1992, he sold 2,000 shares for $15.625 each. After that sale, the market dropped rapidly and as of the time of trial in September, 1993, had never exceeded $15.50 per share, and had reached a low of under $9.00 per share. RR. 795–804. In June, 1992, an additional 4,000 shares could be sold, and in May, 1993, the remaining 30,000 shares could be sold. In June, 1992, the stock sold for $11.875 per share, and in May, 1993, the stock was trading at $9.00 per share. RR. 423–425. On September 10, 1993, the last trading day before trial, Joy stock was selling at $10.875 per share. RR. 347. To calculate the value of his remaining 48,000 shares, O'Sullivan used the market value of Joy stock on September 10, 1993, and claimed damages in the amount of $247,840.00.[7] The jury returned a verdict in favor of O'Sullivan in that amount.

We find that the lower court properly charged the jury on the issue of damages and that the jury's verdict is not against the weight of evidence as to shock one's sense of justice. From the time that O'Sullivan's shares became unrestricted to the time of trial, the market remained volatile. Having fully evaluated the evidence presented by both parties, the jury determined that O'Sullivan's action was commercially reasonable. "The determination of damages lies within the discretion of the fact finder, who weighs the evidence and assesses the credibility of the witnesses." *Penbridge Assoc., Inc.*, 440 Pa.Super. at 423–27, 655 A.2d at 1022–23, citing *Young v. Dart*, 428 Pa.Super. 43, 53–54 n. 2, 630 A.2d 22, 27 n. 2 (1993). We conclude that the court below did not abuse its discretion nor commit an error of law in denying Joy's motion for a new trial on damages.

7. The amount of $247,840.00 represented the difference O'Sullivan would have received from the sale of his 50,000 shares on November 15, 1991 ($799,000.00), and the market values of his 2,000 shares in March, 1992 ($31,080.00 = $31,250.00 − $170.00 in underwriter commissions) and 48,000 shares in September, 1993 ($520,080.00 = $522,-000.00 − $1,920.00 in underwriter commissions). RR. 349–352.

Joy's fourth and final assignment of error challenges the lower court's award of prejudgment interest to O'Sullivan. Appellant asserts that the lower court erred in determining that O'Sullivan's right to prejudgment interest accrued on November 15, 1991. Joy takes the position that any such right should have accrued on March 2, 1992, with respect to O'Sullivan's 2,000 shares, and September 10, 1993, with respect to his remaining 48,000 shares.

Section 5001(b) of the New York Civil Practice Law and Rules provides:

> **(b) Date from which computed.** Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y.Civ.Prac.L & R § 5001(b) (McKinney Supp.1994).[8] *See Frederick v. Clark,* 162 A.D.2d 863, 557 N.Y.S.2d 765 (1990) (prejudgment interest accrued on date cause of action occurred which was deemed due date of first installment for coverage under medical malpractice liability policy).

In the case at bar, the cause of action occurred on November 15, 1991, when Joy registered its stock and breached the Registration Agreement without providing notice to O'Sullivan. Further, we find that damages incurred on that date because O'Sullivan was precluded from selling his shares and deriving a benefit in the amount of $799,000.00. We agree with O'Sullivan that "[b]ut for Joy's breach of the contract, [he] would have had the use of that money from that time." Appellee's Brief at 42. Hence, we conclude that the lower court did not commit an error of law nor an abuse of discretion in its award of prejudgment interest to O'Sullivan.

**8.** Under New York law, the applicable rate for prejudgment interest is 9% per annum. *Action S.A. v. Marc Rich & Co.,* 951 F.2d 504 (2nd Cir.1991).

Having scrutinized Joy's points of error and finding them to be without merit, we, accordingly, affirm the judgment.

Judgment affirmed.